FUTCH, Associate
Justice (dissenting).
Will F. Wider and his wife, Isobel Wider, each made and executed a will at approximately the same time, which was on or about the 20th day of February, 1948. The will of Will F. Wider provided that if his wife Isobel survived him, all his property should go to her, and if she did not survive him, then at his death, all his property should go to Stuart Wider. The will of Isobel contains similar provisions, naming her husband Will F. Wider as beneficiary if he should survive her, and if not then Stuart Wider should be the beneficiary.
Isobel Wider departed this life on June 11, 1948. Whether or not her will was probated makes no difference in this proceeding, though I gather from the record that her will has not been probated.
Will F. Wider departed this life on or about March 15, 1950. The disputed will of Will F. Wider was apparently presented for probate in the County Judge’s Court of Polk County, Florida, on or about October 30, 1950. The delay in offering the will for probate is neither explained nor complained of.
*425 When the will was presented for probate, it showed that the signature of the testator, Will F. Wider, had been out out and pasted 'back in place by means of paper pasted on the back of the sheet from which the signature had been removed, and to the left of this signature was a notation in pencil, “May, 48, W. F. Wider.”
The will of Will F. Wider is contested by H. W. Carraway and Martin G. Wider, on the ground that this mutilation worked a revocation of the will.
After hearing and considering all of the testimony and proofs, the County Judge entered an Order admitting the will of Will F. Wider to probate. Appeal was perfected to the Circuit Court, where judgment was entered, reversing the County Judge, and this appeal was perfected from the Circuit Court to the Supreme Court of Florida.
Mutilation of a will under the statutes of Florida raises a presumption that the mutilation was done for the purpose of revoking the will, and that the will was thereby revoked unless the presumption of revocation is overcome by competent testimony.
Floyd Bernard, a witness called in behalf of the proponent of the will, testified that Will F. Wider told him that he had intended to cut his wife’s signature from her will, but that he had made a mistake and cut the signature from the wrong will, and had thereby cut his own signature from his own will, but had pasted it back. Bernard further testified that Will F. Wider requested him, Bernard, to be sure and remember what he, Wider, was telling him, so that he could testify to it if it became necessary.
Stuart Wider, who is the beneficiary under the will of Will F. Wider, testified that Will F. Wider delivered the will to him shortly after Mrs. Wider’s death, and that he hold him that he had cut his signature therefrom, but by mistake, he having intended to cut the signature from Mrs. Wider’s will, and that he had pasted the signature back in place. Stuart Wider further testified that the will of Will F. Wider was in that mutilated condition when he received it, and that' he presented it for probate in exactly the same condition that it was in when it came into his hands.
Testimony of Will F. Wider’s neighbors and other witnesses strongly indicated that Wider was mentally incompetent for several months prior to his death, and for some time prior to the delivery of the will to Stuart Wider.
There is ample testimony in the record, if believed, to justify the Order of the Probate Judge, admitting-the will to probate.
Mr. B. G. Langston and Mr. B. J. Lang-ston, two of the lawyers who represent the respondents or contestants, testified in an effort to establish the intent of Will F. Wider to revoke his will, as did Judge R. H. Amidon.
Mr. B. G. Langston gave his testimony in the form of an affidavit sworn to before a Notary Public, and did not submit to cross-examination. He testified that “shortly after I drew up the will, for Mr. Wider, he complained about Stuart, and tóld me he had destroyed the • will, and wanted to get me to prepare another will for him.” He further testified that he, with Judge Amidon, called on Will F. Wider, about the middle of the year 1948 in an effort to get him to pay his wife’s expenses at a nursing home, but he testified nothing about any discussion of the will at that time, or at any other time except “shortly after” the will in question had been prepared and executed. The record shows that the will was not destroyed.
Mr. B. G. Langston further testified that he and Judge Amidon went by and got Mr. and Mrs. Bernard to help them talk Will F. Wider into paying for his wife’s care in the nursing home, knowing that Mr.. and Mrs. Bernard were “his friends and that he placed confidence in them.” Mr. B. G. Langston attributes Wider’s refusal to pay for his wife’s care to plain meanness, but Mr. Langston’s description of his behavior, when coupled with the further description given by Judge Amidon, indicates to me that the mind of Will F. Wider was afflicted with something more than meanness. Mr. B. G. Langston further testified that he had' known Wider for twenty years or *426 more, “during which time I have represented Mr. Wider.”
Judge Amidon testified that he and B. G. Langston visited Will F. Wider between May 28th and June 11th. He testifies that Wider at that time went into a fit of anger, did a lot of cursing, and told the Judge that he was “getting too big for my pants since I got to be a Judge”, and that he, - the Judge, got mad, and walked out into the yard; Judge Amidon further testified that Will F. Wider made some statement about his will at that time, and expressed dissatisfaction with Mr. Langston’s representation of him. Judge Amidon gives three versions of what Wider said about the will at the time, as follows: (1) “Well, now, as far as those wills, they are off, that is all off, I have done away with them.” (2) “Mr. Wider has stated recently that he had torn this joint mill up, since it did not suit him”. (Emphasis supplied.) (3) “Evidently that’s the expression that he used, that he had torn it up, because I know I wrote this letter shortly afterwards, and he was expressing at the time, as I recall it, dissatisfaction with Mr. Langston’s rep-prcsentation, and made that remark, he said, ‘you know, those wills you made, I have torn them up or destroyed them, that’s out! ’ ”
Mr. B. J. Langston testified that Wider had told him to have his father go to his, Wider’s home, that the wills which he had drawn had been destroyed, and he wanted a new will made, and that Wider told him at one time that he wanted everything to go to his nephew, but at another time told him that he wanted his brother in one of the Dakotas, and Mr. Carraway, to have his property.
In the last analysis, this case must be decided, not on the misinterpretation of the legal effect of the evidence as a whole, but squarely upon the credibility of the witnesses. As before stated, there is substantial competent evidence to support the findings of the Probate Judge, if the testimony of Bernard, and Stuart Wider, is believed.
The testimony of Floyd Bernard is rejected by the Circuit Judge, as I understand his findings, mainly because of the pencilled notation, “May, 48, W. F. Wider”, and Bernard testified that Wider told him that “since Mrs. Wider passed away, he thought there was no need of having her will and his.”
There is no evidence as to when the notation was placed on the will, nor for that matter, whether it was placed there by Will F. Wider or someone else; nor is there any evidence of why the notation was made. It appears to me that, considering the fact that Floyd Bernard was testifying in open court, under the pressure of gruelling questioning by a skilled trial lawyer under vigorous cross-examination, his testimony is quite credible, when compared with the prepared statement of Mr. B. G. Langston, a skilled veteran of the legal profession, apparently made in the confines of his private office, and not sworn to before the Probate Judge, but before a Notary Public. In this statement we find Mr. Langston saying that he prepared a will for the deceased Will F. Wider, “leaving his property to his wife, if he outlived her.” (Emphasis supplied.)
Of course, this statement 'by Mr. Lang-ston was evidently through the result of an unruly tongue, or the action of a careless stenographer, yet he is presumed to have read the statement 'before signing and swearing to it. He was not subjected to cross-examination, and he does not mention the renunciation of the wills by the deceased, Will F. Wider, as testified to by Judge Amidon.
The testimony of Stuart Wider is condemned because of interest. Two-thirds of the testimony accepted by the Circuit Judge is that of lawyers interested in the final results. Considering fees involved, and the reputation of the firm for winning its cases, the lawyers had, in all probability, as much interest in the case as did Stuart Wider. The testimony of neither of the two other lawyers 'Corroborates the testimony of Judge Amidon. To me it reveals a fit of temper indulged in by the deceased Will F. Wider because Mr. B. G. Langston was simply trying to get him to pay an honest debt, and he tried to divert Mr. Langston by finding fault with his work in connection with preparing the wills. I am of the opinion that the Courts should act with ex *427 treme caution in deciding the case on the evidence of any lawyer who makes himself a witness in behalf of his client’s case. I think this is particularly true where the lawyer, as in this case, knew when he accepted the case that he would be a material witness in behalf of his client. The County Judge saw and heard the witnesses testify, and doubtless he knew all of them personally, and neither this Court nor the Circuit Court, viewing only the typewritten transcript of testimony (and an unusually poor transcript at that) should attempt to pit its judgment, against that of the County Judge, who saw and heard the witnesses testify.
The elder Mr. Langston had been attorney for the deceased many years, and I am constrained to believe, as I suspect the County Judge believed, that if the elder Mr. Langston had known that the deceased wanted a new will, it would have been forth-coming, even though the deceased, in the words of Langston, Jr., did want “about Fifty dollars worth of work done for a nickel.”
I am of the opinion that the judgment of the Circuit Court should be reversed, with directions to enter proper judgment affirming the action of the Probate Judge in admitting the will to probate.